In the Matter of the Judicial Settlement of the Account of Proceedings of STATEN ISLAND NATIONAL BANK AND TRUST COMPANY, as General Guardian of WALTER HANSEN, an Infant.

Surrogate's Court, Richmond County, July 22, 1935.

*Oscar Borth*, for the Staten Island National Bank and Trust Company, former guardian.

*Max Tirschwell*, for Walter Hansen, late ward, contestant.

Smith, S. Prior to June 21, 1926, an action had been brought in the Supreme Court in behalf of Walter Hansen, then a minor, to recover damages for personal injuries. The cause of action was compromised and on June 21, 1926, an order was entered which, among other things, directed " that the defendant pay the amount of said settlement, to wit, the sum of $5,000 to the Staten Island National Bank and Trust Company of Port Richmond, New York, upon the latter's appointment as guardian of the property of said infant, the said Staten Island National Bank and Trust Company of Port Richmond, New York, as such guardian of said infant to retain the balance of said fund after paying the fee allowed to the attorney for the plaintiff, as hereinafter provided, during the minority of said infant and/or the further order of this court."

On June 22, 1926, Samuel Hansen, the father of the late ward, the mother being dead, applied to the Surrogate's Court of the

county of Richmond for the appointment of the Staten Island National Bank and Trust Company as general guardian of said Walter Hansen, and on the same day full letters of guardianship of his person and estate were issued by the Surrogate's Court to said Staten Island National Bank and Trust Company.

The moneys of said late ward were thereupon paid over to said trust company, and after paying over to the attorney, who had brought the action in the Supreme Court, the amount of his fee as provided in the order made in said action there remained in the hands of said trust company the sum of $3,333.34. On December 1, 1926, the late guardian invested the sum of $3,300 of said fund upon bond and mortgage, without application to the Supreme Court for permission so to do. Although the loan was made for a definite period of three years, yet at this time only the sum of $100 has been collected of the principal. The interest on said loan has been paid to the date when last due. Orders of the Supreme Court were made on January 12, 1932, and on December 3, 1932, pursuant to which the trust company paid out the sum of $950 for the maintenance of its late ward, and on January 19, 1933, an order was made by the Supreme Court, upon the application of the former guardian, without notice, striking out of the original order of said court the words, " and/or the further order of this court."

Thereafter on said 19th of January, 1933, application was made to the Surrogate's Court and an order for the maintenance of said late ward was made pursuant to which said trust company disbursed the sum of $525.53.

The late ward was born on February 23, 1914, and became of full age on February 23, 1935, and on April 23, 1935, he filed his application to compel his former guardian to account. On the same day the former guardian filed an account of its proceedings as guardian and its petition for settlement thereof. The late ward thereupon appeared in said proceeding and filed objections to the account in substance that the investment made by the former guardian was:

1. Unauthorized, illegal and in violation of the order of the Supreme Court hereinbefore mentioned;

2. Was imprudent, improper, unwise, unreasonable and not made in accordance with section 85 of the Domestic Relations Law, section 111 of the Decedent Estate Law and section 136 of the Civil Practice Act; and upon the trial of the proceeding endeavored to show:

3. That as the investment was not collected prior to the time when the late ward became of full age that the former guardian

did not exercise in relation to such investment the diligence, prudence, discretion and intelligence that a prudent man of intelligence would employ in his own affairs.

As to the objection considered as No. 1:

The Supreme Court and the Surrogate's Court have concurrent jurisdiction in relation to the appointment of guardians, but when an appointment is made by the Supreme Court a certified copy of the order or decree of appointment and of the bond or undertaking given by the guardian must be filed in the Surrogate's Court (Surr. Ct. Act, § 183), so it was immaterial in which court the appointment was made, but having been made by the Surrogate's Court that court acquired and retained jurisdiction over the guardian and the assets of the ward notwithstanding the direction of the order of the Supreme Court that the fund should be retained " during the minority of said infant and/or the further order of this court." It is very doubtful whether under section 271 of the Surrogate's Court Act, which provides that " when a legacy   *   *   * *or the proceeds   *   *   *   of a cause of action brought in behalf of an infant for personal injuries is payable to an infant or an incompetent, the decree or order shall direct that it be paid to his guardian* or committee of his property, upon his filing sufficient security " (italics mine), that the proceeds would be subject to the further order of the Supreme Court when the same had been paid to a guardian appointed by the Surrogate's Court, which upon such appointment had acquired full jurisdiction over both guardian and the assets of the ward, for the section of the Surrogate's Court Act mentioned is undoubtedly binding upon the court making the order and does not authorize the retention of jurisdiction over the proceeds of the action after the appointment of a guardian. Immediately upon the appointment of a guardian he is required to invest his ward's money without the order of a court. Such requirement is fundamental. Over a century ago (1828) the Court of Errors held, in *DePeyster* v. *Clarkson* (2 Wend. 78, at p. 88), that " It is the duty of trustees and guardians to keep the monies belonging to the trust estate properly invested. Circumstances may justify a deviation from that duty, and those circumstances may be so strong as to require the trustee, in the exercise of sound discretion, to refrain from making investments; but those circumstances rarely occur; and when they do, the trustee is bound to state them to the court as the reasons for his otherwise culpable neglect. Ordinarily, the duty of the trustee must predominate, and he is bound, within a reasonable time to be allowed him for the purpose, to see that the moneys which came to his hands in the course of his agency, are securely and beneficially invested for the benefit of those for whom

he acts; and if that duty be neglected, he must be made chargeable with the interest of the unemployed funds, unless satisfactory cause be shewn for the omission to invest them."

A guardian is a trustee in relation to the ward's funds in his hands, and as stated by Mr. Surrogate WINGATE (*Matter of Ayvazian*, 153 Misc. 467, 477), " The duty of a fiduciary, whether executor or trustee, profitably to employ funds in his hands under penalty of personal liability for his neglect so to do is fundamental."

I do not believe that the attorney for the contestant disputes the rule as to the duty of a guardian to profitably employ the funds of his ward, nor that he would contest the investment had the former guardian been able to collect the amount due thereon, but the fact that the order directing the payment to the guardian made the fund subject to the further order of the Supreme Court provided the opportunity to contest the account, and he relies upon the decision in *Matter of Schmidt* v. *Chamberlain of N. Y.* (266 N. Y. 225) in support of his contention. That decision holds that an order directing the chamberlain to hold moneys deposited with him " ' until the further order of this court,' " did not authorize the chamberlain to make an investment under section 44-c of the State Finance Law, but such decision is not applicable to the matter in issue, for in the *Schmidt* case the authority to invest was only permissive and the disposition of the fund was subject to the further order of the court and was specifically ordered to be held until the further order of the court, while in the present instance the fund was to be held during the minority of the infant or the further order of the court.

Certainly an order to invest the fund could have been procured but it was unnecessary for the reason that the law required an investment of the ward's moneys to be made by the guardian during his minority, the time fixed by the order during which it should be held by the guardian, and a court order was for that reason unnecessary. Also section 183 of the Surrogate's Court Act would indicate that any such direction in an order to pay the proceeds of a recovery for an infant for negligence was unnecessary and without authority.

I, therefore, hold that the late guardian was authorized to invest the funds of its ward notwithstanding the direction in the order directing the payment of said fund to it, and without the direction of any court.

As to the objection considered as No. 2:

Section 85 of the Domestic Relations Law gives to a guardian holding trust funds for investment the power provided by section 111 of the Decedent Estate Law, and said section 111 of said law authorizes fiduciaries to make investments in securities authorized as

investments by a savings bank (Banking Law, § 239) and on bonds and mortgages worth fifty per cent more than amount loaned thereon.

Section 21 of the Personal Property Law also authorizes a guardian to make investments on bond and mortgage to the same extent.

The proof offered upon the trial of the proceeding was that the property was appraised by a real estate expert before the loan was made and his written appraisal made at that time was offered in evidence. The expert also testified in the proceeding that he had had forty-five years' experience in appraising real property and that at the time that the appraisal was made that he had valued the property at $7,500 — land, $5,000; building, $2,500 — and that he had also recently reappraised the property at $6,450 — land, $4,350; building, $2,100. Although the appraiser was shown upon cross-examination to be a stockholder in the trust company his testimony was not of less weight by reason of the fact and I accordingly determine that the investment made by the former guardian of the moneys of its late ward was made in accordance and upon the conditions and authority permitting such an investment, and that section 136 of the Civil Practice Act is not applicable as the moneys belonging to the late ward were never paid into court, but even if they could be so considered then the direction that they be paid to the former guardian entailed no condition requiring approval of investments.

As to the claim that the former guardian was negligent in relation to the investment and should be surcharged with the amount thereof, considered as objection No. 3 herein:

The testimony of the vice-president of the trust company showed that the interest on the investment was paid in full to the date when last due and that the executive committee of the trust company knew that taxes for 1933, 1934 and the first half of 1935 were in arrears upon the property covered by the mortgage and that the mortgagor had been requested to pay the same on several occasions and had stated that he would pay them as soon as he could procure the money with which to do so. That the late ward was receiving the interest under court orders for his maintenance and that there were no moneys with which to pay the expenses of a foreclosure. That the executive committee had considered the matter and had concluded that it was better to receive the interest than to foreclose the mortgage and take over the property and have no moneys for the ward's maintenance. The mortgagor was called as a witness by the contestant, and from his testimony it appeared that the mortgaged property cost him $7,500; that the income therefrom was for a time $420 a year, sufficient to pay taxes, water rates,

insurance premiums and interest on the bond, but that later the assessment for taxes on the property was increased to $16,000; that the building became vacant and that he could not sell any of his other property to procure the necessary funds with which to pay the 1933 and 1934 taxes, and that he could only pay the interest on the bond. That the assessment by the city of New York for taxes has now been reduced to $11,000, and that he would pay the taxes when he could sell other property which he owned for that purpose.

The sole question then for determination is whether the trust company employed such diligence and prudence in the care and management of the investment as· in general prudent men of discretion and intelligence in such matters employ in their own like affairs.

The investment was properly made; the obligation of the mortgagor became due in 1929, but the late ward did not become of age until 1935; the mortgage was, therefore, allowed to run to procure an income; the trust company could have called it at any time, but had it done so it would have been obliged to reinvest the funds until 1935, and for failure to do so would have incurred a personal liability for its neglect. (See *Matter of Ayvazian*, 153 Misc. 467, hereinbefore recited.) The security for the loan was ample, the interest was kept paid and it was not until 1933 when default was made in the payment of taxes; no negligence can be imputed to the trust company in that regard, for the testimony is that the mortgagor was requested frequently to pay them, but he was unable so to do; he had other property which he desired to sell for the purpose of paying his taxes but was unable to find a purchaser. Should the trust company have foreclosed the mortgage and sold regardless of what it received? Had it done so undoubtedly endeavor would have been made to surcharge it with any loss. Had it foreclosed and taken over the property the interest payments would have ceased and the late ward would have lost the income from the investment, for as the testimony shows the building was untenanted for a time and at present only brings twelve dollars a month, and as the property is assessed for taxation at the sum of $11,000, and as the testimony of the real estate expert shows that it is worth twice the amount due on the mortgage, no deficiency judgment would have been allowed.

I believe and accordingly find that the trust company employed such diligence and prudence in the care and management of the investment made by it of its late ward's funds as, in general, prudent men employ in their own like affairs, for, as stated in *Matter of Pinchefski* (179 App. Div. 578), " The rule undoubtedly is, as

claimed by the appellant, that an executor, guardian or other trustee is not a guarantor for the safety of the funds committed to his charge and does not warrant such safety under any and all circumstances and against all contingencies, accidents or misfortune. He is only ' bound to employ such diligence and such prudence in the care and management as in general prudent men of discretion and intelligence in such matters employ in their own like affairs.' "

Judicial notice can be taken of the economic depression that has affected the world for over five years and the many serious losses to investments, properly made, by reason thereof and to such depression the situation in the pending matter can be attributed.

All of the objections made by the late ward to the account of proceedings of the former guardian are, therefore, dismissed, and the former guardian is directed to transfer to the late ward the bond and mortgage described in its account of proceedings upon payment to it of the balance of its commissions and its costs and disbursements in the matter of this accounting, after first applying any funds in its hands to the payment thereof.

Costs of twenty-five dollars and disbursements for filing fees, and service of citation are allowed to the late ward for beginning the proceeding for a compulsory accounting, payable to his attorney, to be collected by the trust company upon the transfer of the securities to its late ward.

Enter decree accordingly, which may also provide for further direction at the foot thereof if the directions therein are not carried out within thirty days after service of notice of entry of the decree.